All right, we're ready. You have 15 minutes total. Thank you, Your Honors, and good morning. May it please the Court. Benjamin Wiesinger for the petitioner, Manuel Vaquera. Nobody likes being ignored, certainly not me. I've been representing this gentleman for 15 years, I believe, and I've been making the same argument that entire time, that this case is about the cumulative effect of hardship upon his qualifying relatives, his five U.S. citizen children. The cumulative effect, and yet in neither decision of the BIA do they even make a passing reference, even in boilerplate language, about that part of the hardship analysis. And this isn't just me complaining about being ignored and having my arguments ignored. This Court has a long history of telling the Board, you are not free to simply ignore arguments of respondents and their counsel. And that, in and of itself, Your Honors, is reversible error. The Board said in its first decision, the respondent has not shown exceptional and extremely unusual hardship to a qualifying relative. And then in the second decision on the motion to reopen, it treats the hardship analysis separately as to two of the children, and doesn't, again, even hint at that the Board is considering hardship in the aggregate, or in the totality of the circumstances, or in the cumulative effect. And yet that's been in my pre-trial brief, that was in argument to the Immigration Court, that's been on the briefs and on appeal, that's been on the motion to reopen. It's everywhere, and yet nowhere in either of the Board's decisions in this case. So the motion to reopen was based on Mr. Vaquera's voluntary decision to move out of the communal house. And can you cite any case where a motion to reopen was granted based on the applicant's voluntary action like that? No, Your Honor. Not that I have found. But it is a change in circumstance. And the argument is that without the constant care and support of all these other family members, that the case is much more akin to the Racinus matter. You know, single mother, six children. Well, but if we were to agree with your argument, doesn't that mean that everyone then can, if the first argument doesn't work, then they can do something else and then make the argument again, but take a voluntary action? I mean, you could become homeless and then say, well, this is really going to be a hardship to my family, or... Well, the implication, Your Honor, is that... I mean, it was kind of shocking how many people were all living in one house to start out with. Related to that, was this voluntary? There was something in one of the documents that said that there was some kind of an order to do something. No. No, Your Honor. I don't believe that was... The wife said something about that, I thought. Well... Not necessarily related to him, but to something about the change in the circumstances. In testimony and in some of the affidavits, but in testimony especially, my client's, the mother of my client's children mentions how difficult that living situation was. No, I meant on the reopening. There was some document that suggested that as to some aspect of the living arrangement, there was outside intervention. I... No? I'm not recalling that, Your Honor. I apologize. I'll take another look during my... But that's not what you expected to establish. No, no. And so, the implication of that argument is that my client moved out just to try to help better his immigration case. There's nothing in the record that actually says that, but the... My client felt compelled to move out for any number of reasons, not the least of which he was living under the same roof as his partner's husband. And so, it was... He was going to move out eventually. So when the BIA on January 22nd, 2021 denied Mr. Vaquera's motion to reopen, the Ninth Circuit had yet to issue its opinion in Fonseca v. Garland. Why should we apply the standards set forth in Fonseca v. Fonseca to the BIA's earlier decision? Because Fonseca did not announce a new rule or a new standard. It merely clarified what the board's own standards are. And if you look at Fonseca, right there in the first two paragraphs of the decision, it cites to matters of LOG and matters of SV, which actually provide the correct standard of review. And so, the standard of review for a motion to reopen has been there since the 90s and early 2000s. And Fonseca, I believe, merely crystallized what the standard always was. But I thought that it would likely change. At least there was COLO. I'm not quite sure how to say that. I mean, the second paragraph of Fonseca talks about how there were two standards and now, after Fonseca, it's reasonable likelihood, instead of would likely change. Correct. And so the board's own precedent might have been a little murky there. But the board correctly stated what the standard is in SV and LOG. I believe it might have been the different procedural postures, different types of cases, COLO versus SV and LOG. And so maybe that was what was causing the confusion. But, you know, Fonseca merely stated what the standard always was and said, this is the standard you are to apply. It seems to me it would just be futile to send it back. So how do you answer the futility argument? Because of the board's failure to address my client's arguments in the first instance. The cumulative hardship effect, which is only increased by moving out and being on his own with his five children. So with the moving out, are you assuming that the children could not still be taken care of by the people who are still in the group house? Yes. If your client left? Why is that? Well, because that's what was said in the testimony. That these other, you know, the husband and the other children had no interest in caring for and parenting my client's children. We have to take their testimony at face value on this one. And does that have to do with the moving out? Or was that just already true? That one is a little unclear, actually. The record does not make that actually clear. And I will concede that the mother of my client's children is still actively involved in their lives. And so it's not like she wouldn't be there anymore. But then she'd be in that same position of having to care for all these children by herself. The reference I had was in the wife's letter or declaration on reopening. She says, my older teen adults have moved out due to the Honorable Judge Richardson decision on commutable living. It caused outraged mixed emotions, arguments, and emotional stress. Oh, now I remember. What is that about? That simply is what my client's wife says, or my client, the partner. So you don't know whether that, if we sent it back and it was actually determined to reopen, whether that would lead to any conclusion that this wasn't voluntary. You don't know. No, Your Honor. But now, I do remember reading that now. And the court is obviously correct about that. For whatever reason... Do you know what the order was? Do you know what it's referring... Do you know what the order is that she's referring to? Well, I can only conclude that it was Judge Richardson's order denying my client's application. No, no, no. I don't think so. It sounds more like some sort of family law order or something. I guess I'm not sure. She actually mentioned Judge Richardson, right? Yes. Well, that was who we were before in court. In the IJ? Yes. So for whatever reason, whatever reason, my client felt compelled to move out. The situation wasn't great to begin with. He moved out and the facts speak for themselves. We have a single father, five U.S. citizen kids. Three of them have at least some medical issues. And I'll concede on the record that no, the hardship to one single qualifying relative was not sufficient to meet the standard. But again, that's not the point. The main point has always been the cumulative effect, the totality of circumstances. The board failed to properly analyze the case the first time and the second time. And so regardless of whether the change... In the first time, the board cited Burbano. So are you also saying that the IJ didn't consider everything? Judge Richardson did pay lip service to the correct legal standard in his decision. I'll concede that. But then, so the board in that first decision cites the matter of Burbano, but then there's that strange sentence right after the parenthetical. The respondent has not shown exceptional, extremely unusual hardship to a qualifying relative. So how old are the kids now? I believe the oldest is 19. And I can't track the rest of them, Your Honor. Well, it's been a long time. It has. Going on a long time. So they're a lot older now, right? Correct. Correct. If they were all over 18, would that make a difference now? No, Your Honor. For two reasons. One, as long as they're under 21, they're still qualifying. If they were all over 21, would that make a difference? I've made the argument any number of times that no, that this court's decision deferring to the board's analysis on that issue, that once the children are over 21, they cannot be qualifying relatives, and the ages are set when the judge makes a decision. Well, if they were all over 40, would that make a difference at some point? Does their age make a difference? At some point, yes. I'll concede that. Okay, that much. I'll concede that at some point. However, this is a future-oriented analysis. Matter of fact, Figueroa says that. Do you want to save any time for rebuttal? You didn't tell me that. I was about to ask for that. So I'll just make my real quick point that it is a separate legal issue regarding this age-out question, and I'd be happy to brief that issue. I've actually briefed it a number of times to this court. But I haven't shared it on any screen yet, so it doesn't matter. Right. Okay, I'll save the rest of my time for rebuttal. Thank you. All right, we'll hear from the government. Good morning. Good morning. May it please the Court, Your Honors. Joanna Watson on behalf of the government. Substantial evidence supports the agency's determination that Mr. Bequer did not demonstrate the requisite hardship in the instant case. These cases are all very sad, and nobody wants to lose a parent, to have to go back to the removal country. But we have the five kids. None of them have anything significant. You know, they've had some learning disabilities that appears, some treatable conditions, and none of that, you know, cumulatively reaches that high standard. Well, I guess the key question here, I mean, first of all, do you agree that the, I think the board did agree, I think you did agree in your brief that the board on reopening applied the wrong reopening standard? Correct. And... So the question is, what do we do about that, if anything? Well, I argued, you know, I conceded that in the brief, but futility and PARC, I've raised, I mean, this, what would happen if this got sent back for the reasonable likelihood, is the board is just going to reach the same conclusion with slightly different terminology. I mean, he, on reopening, you know, he submitted, they moved out of the house. One of the children who is actually, you were asking the age of the children now, and at the time of the hearing, they were 6, 8, 9, 11, and 13, and now they are 15, 14, 19, 17, and the oldest daughter is 20, who had the learning disabilities and behavioral issues. And so they moved out of the house. She had continued issues in school, but assuming she's graduated, I think by now, and then one of the other children was being evaluated or had an IEP in place for some learning issues. But it showed that the mother is still in their lives. She was listed, you know, on the form to contact for the IEP. And the only reason she didn't participate was because she was unfamiliar with technology during the pandemic. And so why does the change of the children's domicile require a re-evaluation of the hardships inherent in Mr. Vaquera's removal? What factors indicate a remand would be futile? Because of the fact that nothing has changed about where the children will remain in the United States, which is unlike Madera or Racines, where you had a single mother who had custody of five or six children, and she had no other support and had family in the United States. In this case, there's no indication that they wouldn't be able to live with the mother. There's nothing in here. So the board presidential case that says that, you know, assuming if there's not evidence to the contrary, you assume that the children are going to remain with the parent that remains in the United States. And there's no indication here. And, you know, they're in the same town. Like, you could take judicial notice of the addresses. They live three miles apart. So I think the mother is still very much in their life. And she talks about also all the other children that had moved out of her house. So it seems like it's possibly a less chaotic situation now. And then getting to the medical issues, they were all treatable conditions, and they'd still be able to maintain their insurance or be treated at the native hospital because the mother's Native American and presumably has a lot of resources based on that. And I mean, I concede that these cases are sad, but it's a high bar. And even, you know, with the reasonable likelihood of changing that, you know, the board applying that standard, there just isn't that it hasn't been met, even under a reasonable. Because that's all we have is another child with an IEP. And, you know, another child who is having behavioral issues in school is presumably graduated at this point. Don't we have to speculate to reach that result, though? I mean, the board applied the wrong standard. It should have been a more lenient standard. There was a change because the first decision relied on the resources in the group house. They moved out for some reason, which suggests that the group house isn't functioning very well. So how is it not possible that under a less lenient or under a more lenient standard, the board would think of this differently? Because it's his burden, and he presented no evidence whatsoever that his partner, which she actually referred to as partner, as if they're like still together in the letter she submitted at the beginning of it. There's no indication that she would not be able to take in these kids. And that was his burden. I mean, if this was a different scenario, you know, you had a child who's in the hospital with a debilitating condition, and they were going back with him, and there's no indication that you'd be able to get medical, you know, the children would get medical care. They had severe, severe learning disabilities. And things like that, and they were going back to Mexico, which is the matter of Racines scenario, which Petitioner keeps repeatedly relying on, which is a completely different scenario. There just isn't, there isn't enough. They moved out, but there's no indication that the mother would not be able to care for these children. Are you aware of any case where someone takes a voluntary action of moving out, say? Any case that says that a voluntary action to make your circumstances worse, you can't take advantage of that? Or is there anything out there on that point? I can't think of anything offhand. If I do, I'd be happy to submit a 28-J after the fact, but I can't think of- Well, your friend on the other side said he's not aware of anything that, how the voluntary, it just seems like if, that we wouldn't want a situation to incentivize people to make their situation worse so that they could have a redo. But on the other hand, he wasn't aware of anything. You're not either? No, I'm not aware of anything. And actually, you know, this could be looked at almost as, I mean, I don't want to, you know, he owns a house now. He has a house he could sell and have equity to actually help support his kids and help this transition. But I'm saying it could be looked at from that perspective. But the board here, even under the reasonable likelihood standard, there just isn't enough here. You know, I would say if he had shown, like, the mother was just completely out of their lives, which was the situation in Racina's. She had received like $150 a month in child support that had stopped, and the father was nowhere to be found. We just don't, we don't have a situation like this. And it was his burden to show, you know, a reasonable likelihood. And he hasn't shown that his wife, not his wife, his partner would not be able to take in these kids. And then you have in the underlying case too, she had taken in nieces and nephews. And I think a son was stabbed and she took in the grandchildren for a while, but that was a temporary situation. So based on this woman's actions and adopted children on having so many children, there's just nothing here that she wouldn't take those children in. So if there's no further questions, I would ask that the court deny the petition as to the first petition, because there was no exceptional and extremely unusual hardship. And as to the second petition, you know, if the court truly believed that a reasonable likelihood standard would have changed the board's analysis, I'm not saying it would. I'm saying it would, they'd reach the same finding, but just using different terminology. But if the court would find that, then, you know, we could remand that case separately, but there'd be no reason under the first one. But ultimately, I'd request the court deny the petition as to both cases. All right. Any additional questions? There do not appear to be. Thank you for your argument. Thank you. All right. Mr. Weisinger, are you, or Weisinger? It's Weisinger, thank you. Weisinger, thank you. I know the German, you pronounce the second vowel, right? I should get that right on the second day. Thank you, Your Honor.  Reaching the same conclusion based, using slightly different language. That's got to bother you a little bit. What Ms. Watson is essentially saying is that remand is useless because the board's just going to deny it again, and they'll incorporate the right magic formula. When you're a trial judge, you make those sort of decisions all the time. There's errors all the time, and you decide whether they're harmless or prejudicial. And so here, it's basically, is it futile? And if you think that it's a, basically, it's a change without, it's, yes, you acknowledge that it's a change, but under the circumstances, you can't see any reasonable juror or any jurist reaching a different conclusion. The law does allow you to find futility, right? It does. But if the... No, we do not. It's sort of complicated. It's partly for a Chenery sort of reason, in that we're not supposed to decide things, the board's supposed to decide it, and the ordinary remand rule and all that. So if they made an error, there's a little carve-out for futility, which is something different than harmless error, I gather. I mean, what is the standard for how obvious it has to be that this is useless for us to not remand? That's a tough question, Judge Berzon. Of course, it's a tough question. You know, if I'm being completely frank... Well, I certainly would want you to be. That's what you're here for. Do I have confidence that the board's going to do the right thing, given a third chance? No, not much. Not without this court telling it to. You don't have to have confidence that they will. I mean, that's what I'm asking you. Where does this futility standard come from? We have a case that says the standard is futility? No, no. But not that I know of, at any rate. But the court, your question speaks to whether remand would be any good, make any difference. And all we can do from... How sure do we have to be that it wouldn't make any difference? That's what I'm asking you. I think this court would have to be 100% sure that it would make zero difference in order to not remand. But frankly, you're 100% sure it's not going to make any difference. That's the cynic in me speaking, Your Honor. Doing this for a long time and knowing that the Board of Immigration Appeals, ever since Racinus, has almost been walking that decision back. With the few published cases that have come out, with the published case that's come out last year about children with autism, not rising to the level of exceptional, extremely unusual hardship. So it's the cynic in me saying it's probably not going to make a difference, but it should. And the court should make sure that we tell the Board that this is the standard and to properly decide this case on the right standard. Thank you very much for the time, Your Honors. I appreciate it on behalf of my colleagues. We won't see you again because this is our last day. This is our last day here. Have a good weekend. Thank you, Your Honor. Thank you to the government as well. This matter is submitted. All right.
judges: BERZON, CALLAHAN, FRIEDLAND